## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **VENETA POPOW,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL NO.** |
| | : | **3:07-cv-1620 (VLB)** |
| **TOWN OF STRATFORD ET AL.,** | : | |
| **Defendants.** | : | **February 12, 2010** |

## MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. #21]

The Plaintiff, Veneta Popow, individually and as Administratrix of the Estate of Stoil Popow (hereinafter the "decedent"), brought this action for damages against the Defendants, the Town of Stratford; Patricia Patusky, Director of the Parks and Recreation Department for the Town of Stratford; Stratford Fire Department Deputy Chief Michael Hostetter; and Stratford Firefighters Craig Tibbals, Dennis Cassia, Michael Campelingo, Thomas McCabe, and Matthew Morse.[1]  This action arises from the death of the Plaintiff's decedent in a "kite-surfing" accident off of Long Beach in Stratford, Connecticut on January 21, 2006. The Plaintiff asserts sixteen counts against the individual Defendants and the Town of Stratford sounding in negligence and nuisance, as well as indemnification claims against the Town of Stratford for the negligence of the individual Defendants pursuant to Conn. Gen. Stat. § 7-465.  Presently pending before the

---

[1]  **Defendants Hostetter, Tibbals, Cassia, Campelingo, McCabe, and Morse are hereinafter collectively referred to as the "Firefighter Defendants."**

Court is the Defendants' motion for summary judgment.  <u>See</u> Doc. #21.  For the reasons that follow, the Defendants' motion is GRANTED.

## I. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

The following facts relevant to the Defendants' motion for summary judgment are undisputed unless otherwise noted.

During the early afternoon hours of January 21, 2006, there were as few as six, but possibly as many as twenty-five, people kite-surfing in Long Island Sound off of Long Beach in Stratford, Connecticut.  The temperature was unseasonably warm that day and the wind was blowing inland.  Despite the warm air temperature, witnesses estimated that the water temperature was between 38 degrees and 40 degrees Fahrenheit.  In January, there were no lifeguards or other rescue personnel on duty at Long Beach.  There were no warning signs in place on the beach warning of the hazards of entering the water during the winter, nor were there any barricades or other fencing limiting the public's access to the beach.  According to the Plaintiff, the Defendants took no action to warn kite-surfers to come out of the water or to supervise the area during the winter, despite their knowledge that the beach area was being used by kite-surfers year round.

At approximately 3:30 p.m., the weather took a turn for the worse.  Substantial storm clouds form, and it began to get dark.  In addition, the wind changed directions and began blowing strongly away from shore, creating "squall" like conditions.  As a result of the change in wind and light conditions, almost all of the people kite-surfing returned to shore.

2

The decedent, Stoil Popow, arrived at Long Beach at approximately 3:30 p.m., when the weather turned for the worse.  Robbie Guimond, a certified Kitesurfing Safety Systems instructor, was present at Long Beach when the decedent arrived.  Guimond had kite-surfed with the decedent at least 50 times since 2001.  He described the decedent as a beginner-level kite-surfer who was "very reckless," "very stubborn," and "unwilling to take advice from others." Guimond Tr. at 17.  He further stated that the decedent was "a liability from day one, and it continued right on through his career."  Id.

According to Guimond, upon his arrival the decedent told him that he intended to kite-surf for a short time before the end of the day.  The decedent then began to prepare his equipment, including a recently purchased, but previously used, kite and dry suit over a wetsuit.  Guimond express to the decedent his concerns about the equipment, but the decedent failed to heed his warning. Guimond testified at his deposition that kite-surfing at the time of day that the decedent arrived with the wind blowing away from shore would be "very unusual" for someone concerned for their safety.  Id. at 41.  However, the decedent was known in the kite-surfing community for taking these types of risks.

After preparing his equipment, the decedent entered the water and began kite-surfing.  By approximately 4:00 p.m., every kite-surfer present at the beach except for the decedent and perhaps one other person had returned to shore.  Due to the dangerous conditions created by the wind change, darkness, and incoming storm, Guimond observed from shore as the decedent kite-surfed.  Guimond

3

testified that the decedent had difficulty controlling his kite in the strong winds soon after he entered the water.  The decedent reacted by "ditching" or "flagging" his kite, a maneuver designed to "depower" the kite.  Id. at 43-44.  Guimond described "ditching" or "flagging" a kite as a "last course of action" that causes the kite to fall into the water.  Id. at 44-45.  After the decedent "ditched" his kite, he fell into the water along with it.

Guimond testified that the decedent was in danger as soon as he fell into the water with his kite, a situation he referred to as a "kitemare."  Id. at 45.  According to Guimond, the decedent was partially submerged in the water but conscious after he fell.  He began to float approximately 300 to 400 feet away from shore while holding his kite.  In Guimond's opinion, the decedent could have swam to shore from that distance, and he signaled to the decedent to swim to shore.  However, the decedent made no attempts to swim to shore, and instead drifted parallel to the shore while Guimond visually followed him.

When the decedent made no attempt to swim to shore, Guimond called 911 from his mobile phone.  A second witness present at the beach also notified a police officer in the Long Beach parking lot of the decedent's situation.  Guimond's initial 911 call was routed to Long Island.  Guimond then made two or three additional 911 calls that were routed to Trumbull, Connecticut.  There was no emergency hard wired telephone in this area of Long Beach.  In addition, there was no cellular tower in the area, and the Plaintiff claims that telephone reception was poor as a result.  The Plaintiff asserts that the poor cell phone service

4

resulted in the calls for help being dropped, delaying the response of rescue personnel.  The Defendants dispute this fact, asserting that none of Guimond's calls were dropped as a result of poor reception.

After making three unsuccessful 911 calls, Guimond directly called the Bridgeport Police Department.  Guimond informed the dispatcher at the Bridgeport Police Department that there was a person in the water in the Long Beach area who needed assistance.  The dispatcher advised Guimond that a boat was being dispatched to the scene.  After speaking to the Bridgeport Police Department, Guimond called the direct telephone number for the Bridgeport Harbor Patrol captain or first mate on board the dispatched vessel.  Guimond made direct contact with the dispatched Bridgeport Police Department vessel, but cell phone reception in the area where the vessel was traveling was poor and his calls were dropped several times.

Guimond maintained direct visual contact with the decedent during his phone calls to the Bridgeport Harbor patrol and relayed his approximate location.  Guimond also contacted the United States Coast Guard.  However, Guimond did not directly contact the Town of Stratford Fire or Police Department.

At approximately 5:00 p.m., the Stratford Fire Department received a report of a "windsurfer" in distress from Centralized Medical Emergency Dispatch ("CMED").  At approximately 5:02 p.m., the Stratford Fire Department dispatched two fire engines and a rescue vehicle towing a fourteen foot long inflatable hard bottom "zodiac" boat in inflatable pontoons.  The Stratford Police Department has

a larger boat, but it is not in service in January.  The Coast Guard received notification of the incident at approximately 5:01 p.m., and dispatched two rescue boats.  At approximately 5:05 p.m., the City of Milford received notification of the situation but did not respond because it did not have a boat in service.  At approximately 5:08 p.m., the two fire engines from the Stratford Fire Department and the rescue vehicle towing the zodiac boat arrived at the Birdseye Street boat launch ramp.

Pursuant to Stratford Fire Department policy, the incident commander possesses the sole discretion to engage in a rescue attempt, including whether to launch the zodiac boat.  On January 21, 2006, Deputy Chief Hostetter was the incident commander for the subject incident.  Despite safety concerns, Hostetter decided to launch the zodiac boat after he received a report from fellow firemen that they had made visual contact with the decedent's kite.  The most senior firefighter aboard the zodiac boat is considered the captain of the vessel upon its launch and has the discretion to discontinue a rescue operation if he determines that conditions are unsafe.

The Birdseye Street boat launch ramp, from which the zodiac boat was launched, was located approximately four miles from the decedent's last reported location in the Housatonic River, which meets with Long Island Sound.  At the time of its launch, in accordance with department policy, the boat had three firefighters on board – firefighters Tibbals, Campelingo, and Morse.  The Fire Department also deployed four "spotters" on the shore of Long Beach in an effort

6

to identify the decedent's location.  The zodiac boat experienced engine and motor difficulties when it reached the mouth of the Housatanic River.  As a result of these difficulties, the zodiac boat was unable to continue toward the decedent's reported location or back to the site where it was launched.  The firefighters remained on board the boat, which they tied to a buoy, for approximately ninety minutes until the boat was towed by the United States Coast Guard back to the Birdseye Street launch ramp.  The Plaintiff claims that, because the zodiac boat became disabled, Coast Guard equipment and personnel had to be diverted from attempting to rescue the decedent in order to rescue the firefighters.

The Bridgeport Harbor Patrol and United States Coast Guard vessels arrived in the area where the decedent entered the water approximately twenty to forty-five minutes after he had "ditched" or "flagged" his kite.  It was "full dusk" or "near dark" when they arrived.  Id. at 57.  Guimond had observed the decedent's kite "tumble" into the air shortly before their arrival, and he advised the Bridgeport Harbor Patrol that the decedent was no longer with the kite.  The Harbor Patrol informed Guimond that its protocol required them to retrieve the kite.

As of 7:00 p.m., approximately two hours after CMED had notified the Stratford Fire Department of the incident, the decedent had not been located despite a search by the Bridgeport Harbor Patrol and the United States Coast Guard.  At this time, Assistant Chief Cassia relieved Deputy Chief Hostetter and took control of the scene.  The United States Coast Guard located the decedent's body in Long Island Sound the following day, January 22, 2006.

7

On September 17, 2008, the Plaintiff filed suit against the Defendants in this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the Plaintiff is a New York resident.  The Defendants filed the instant motion on July 7, 2009, and the Plaintiff filed her opposition thereto on September 29, 2009.

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 59 (2d Cir. 2006) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving party bears the burden of showing that no genuine issues exist as to any material facts.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986).  If the moving party meets its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." <u>Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.</u>, 302 F.3d 83, 91 (2d Cir. 2002).  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." <u>Western World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted).  A party also may not rely on conclusory statements or unsupported allegations that the evidence in support of the motion for summary judgment is not credible.  <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 532 (2d Cir. 1993).

The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." <u>Huminski v. Corsones</u>, 396 F.3d 53, 69-70 (2d Cir. 2004).  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  <u>Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH</u>, 446 F.3d 313, 315 (2d Cir. 2006).

### B.  Negligence Claims Against the Firefighter Defendants

The Plaintiff alleges that the Firefighter Defendants were negligent by 1) "Failing to adequately warn the decedent and others similarly situated of the hazardous and unsafe conditions present at Long Beach and the surrounding waters of the Long Island Sound by, among other things, failing to post warning signs[;]" 2) "Attempting to rescue the decedent with inadequate and/or defective

equipment incapable of completing a rescue in the conditions confronting the decedent[;]" and 3) "Failing to institute adequate and reasonable procedures for use in the event defendant, Town of Stratford, was notified of a missing person and/or if said procedures existed, in not following said procedures when plaintiff decedent became missing."  Compl. ¶¶ 36, 49, 63, 76, 89, 102.

The Court first addresses the Plaintiff's contention that the Firefighter Defendants were negligent by failing to post warning signs or otherwise warn the decedent and others of the hazardous and unsafe conditions at Long Beach and the surrounding waters of Long Island Sound.  "The essential elements of a cause of action in negligence are well established:  duty; breach of that duty; causation; and actual injury."  Mafucci v. Royal Park Ltd. Partnership, 243 Conn. 552, 566 (1998).  "The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand."  Id.  "If a court determines, as a matter of law, that a defendant owes no duty to a plaintiff, the plaintiff cannot recover in negligence from the defendant."  Id.

Here, the Firefighter Defendants have submitted an affidavit from Stratford Fire Chief James Cavanaugh which attaches their job descriptions and demonstrates that it is not within the scope of their job duties to warn the public of the condition of the waters in Long Island Sound.  See Def. Ex. G.  The Plaintiff adduces no evidence to rebut Cavanaugh's affidavit.  Instead, she agues that there is a question of material fact as to whether the Firefighter Defendants had a duty

to contact the local police if they knew that dangerous activity was taking place on a municipal beach.  However, there is no evidence in the record that any of the Firefighter Defendants were aware that the decedent and others were kite-surfing at Long Beach prior to the day in question when they responded to the CMED report of a "windsurfer" in distress.  The Plaintiff's suggestion otherwise is mere speculation or conjecture, which is insufficient to withstand a motion for summary judgment.

Next, the Firefighter Defendants assert qualified immunity with respect to the Plaintiff's allegations of negligence in connection with their attempt to rescue the decedent.  "The [common-law] doctrines that determine the tort liability of municipal employees are well established . . .  Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts . . .  Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature . . .  The hallmark of a discretionary act is that it requires the exercise of judgment . . .  In contrast, [m]inisterial refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion."  Martel v. Metropolitan District Comm'n, 275 Conn. 38, 48-49 (2005) (internal citations and quotation marks omitted).

"Municipal officials are immune from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the

limits desirable in our society.  Discretionary act immunity reflects a value judgment that - despite injury to a member of the public - the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury.  In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion.  This is because society has no analogous interest in permitting municipal officers to exercise judgment in the performance of ministerial acts."  Doe v. Peterson, 279 Conn. 607, 614-15 (2006) (internal citations and quotation marks omitted).

As a general rule, Connecticut courts consider acts performed by firefighters when they are in the line of duty to be discretionary acts.  See Kumah v. Brown, No. CV085015502S, 2009 WL 242378, at *5 (Conn. Super. Ct. Jan. 7, 2009); see also Glorioso v. Police Dep't of Town of Burlington, 49 Conn. Supp. 200, 205 (2004) ("While it is so that statutes, regulations, and policies *can* create ministerial duties, when they relate to fire, police, or other public safety services, they are most often held to create discretionary duties.").  In addition, "[t]he provision of emergency medical services to members of the public is a discretionary act."  Glorioso, 49 Conn. Supp. at 205.  In this case, Stratford Fire Department policy provides that the incident commander possesses the sole discretion to engage in a rescue attempt, including whether to launch the zodiac

boat.  Upon the zodiac boat's launch, the most senior firefighter aboard the vessel is considered captain and has the discretion to discontinue a rescue if he determines that conditions are unsafe.  In making the determination whether to initiate, continue, or terminate rescue efforts, the firefighter in charge weighs the conditions at the scene, the likelihood of success of the rescue, and the risk of harm to the participating firefighters.  See Def. Ex. C at 17-18.  It is clear that the decision made by the Firefighter Defendants to launch the zodiac boat, the procedures utilized in attempting to rescue the decedent, and ultimately the decision to call off their search for the decedent required the exercise of judgment based on an analysis of numerous factors.  Therefore, the actions taken by the Firefighter Defendants on the date in question were discretionary.  See Kumah, 2009 WL 242378, at *5 ("By their very nature, decisions regarding where to place a fire truck on the roadway, how many road cones to put out and where to put them, and how to light an accident scene are discretionary."); Glorioso, 49 Conn. Supp. at 203-05 (manner in which fire department responded to 911 call, timeliness of response, and number of firefighters and emergency personnel available to respond involved the exercise of discretion); Evon v. Andrews, 211 Conn. 501, 506-07 (1989) (failure of fire department officials to properly enforce applicable statutes, regulations, and codes, to make reasonable and proper inspection of a multifamily rental unit for fire safety hazards, and to prescribe remedial action to be taken by owners, were "acts [that] required the exercise of judgment").

13

The Plaintiff contends that there is a genuine issue of material fact by conclusorily asserting that the zodiac boat was not properly maintained or repaired, which caused it to experience mechanical difficulties and diverted Coast Guard equipment and personnel from attempting to rescue the decedent. However, the Plaintiff has no evidence to support this claim.  Instead, the only evidence in the record regarding the reason for the zodiac boat's mechanical difficulties is the deposition testimony of Hostetter, who opined that the engine failure was possibly the result of rough seas that occurred due to the rapidly changing weather.  Def. Ex. C at 14-16.  Moreover, the evidence does not indicate that the disability of the zodiac boat diverted Coast Guard resources from attempting to rescue the decedent.  After the zodiac boat became disabled, the firefighters occupying it remained in the water tied to a buoy for approximately ninety minutes, during which time a Coast Guard boat and a Bridgeport Harbor Patrol boat continued the search.  A Coast Guard boat picked up the individual firefighters at approximately 6:24 p.m., and that boat than continued the search with the firefighters on board.  See Def. Ex. E.  Accordingly, the Court finds that the acts of the Firefighter Defendants were discretionary as a matter of law.

Since the Firefighter Defendants engaged in discretionary acts, they are entitled to immunity unless an exception applies.  There are three exceptions to discretionary act immunity.  "Each of these exceptions represents a situation in which the public official's duty to act is [so] clear and unequivocal that the policy rationale underlying discretionary act immunity - to encourage municipal officers

**14**

to exercise judgment - has no force.  First, liability may be imposed for a discretionary act when the alleged conduct involves malice, wantonness or intent to injure.  Second, liability may be imposed for a discretionary act when a statute provides for a cause of action against a municipality or municipal official for failure to enforce certain laws.  Third, liability may be imposed when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . ."  Peterson, 279 Conn. at 615-16 (internal citations and quotation marks omitted).

As the Plaintiff concedes, the first two exceptions are clearly inapplicable to this case.  Therefore, only the third exception, the identifiable person / imminent harm exception, warrants further analysis.  The Connecticut Supreme Court has "construed this exception to apply not only to identifiable victims but also to narrowly defined identified classes of foreseeable victims."  Durrant v. Board of Educ., 284 Conn. 91, 100 (2007).  "In delineating the scope of a foreseeable class of victims exception to governmental immunity, our courts have considered numerous criteria, including the imminency of any potential harm, the likelihood that harm will result from a failure to act with reasonable care, and the identifiability of the particular victim."  Id. at 101.  In order to invoke this exception, a plaintiff must demonstrate "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm."  Peterson, 279 Conn. at 606.  An "imminent harm" has been described as a harm that is "significant and foreseeable" and

involves a "limited time period and limited geographical area."  Purzycki v.
Fairfield, 244 Conn. 101, 110 (1998).

Fundamentally, the identifiable person / imminent harm exception does not
apply here because the facts of this case do not demonstrate a *failure* to act on the
part of the Firefighter Defendants.  Instead, the undisputed facts show that upon
receiving a CMED report of a "windsurfer" in distress, the Firefighter Defendants
immediately dispatched two fire engines and a rescue vehicle towing the zodiac
boat.  Minutes later, they launched the zodiac boat and proceeded to the location
where the decedent was last seen in an attempt to rescue him.  They also
coordinated with the Coast Guard and Bridgeport Harbor Patrol, which each
launched rescue vessels as well.  Tragically, the rescue efforts were unsuccessful,
in large part due to weather conditions beyond the control of the Defendants or
anyone else.  Holding firefighters liable for a courageous but unsuccessful rescue
attempt would defeat the purpose of qualified immunity, which is to ensure that
government officers are "free to exercise judgment and discretion in their official
functions, unhampered by fear of second-guessing and retaliatory lawsuits."
Peterson, 279 Conn. at 615.  Ultimately, imposing liability upon the Firefighter
Defendants under the circumstances of this case could have the deleterious effect
of discouraging future rescue attempts.

The Plaintiff attempts to escape the conclusion that the Firefighter
Defendants are entitled to qualified immunity by shifting the focus from the rescue
attempt itself to their alleged failure to properly maintain the zodiac boat.  As

16

discussed previously, however, the Plaintiff has cited no evidence in the record supporting the assertion that the zodiac boat was improperly maintained or repaired.  Therefore, the Plaintiff's negligence claims against the Firefighter Defendants are barred by qualified immunity, and must be dismissed.

    C.  <u>Negligence Claims Against the Town of Stratford and Patricia Patusky</u>

Next, the Plaintiff alleges that the Town of Stratford and Stratford Director of Parks and Recreation Patricia Patusky were negligent by 1) "Failing to warn the decedent and others similarly situated of the hazardous and unsafe conditions present at Long Beach and the surrounding waters of Long Island Sound by, among other things, failing to post warning signs[;]" 2) "In inviting the public to use Long Beach when there were no lifeguards on duty[;]" 3) "Failing to adequately warn that the lifeguards were not on duty[;] 4) "Failing to close the beach and/or erect barriers limiting the public's access to the beach[;]" 5) "Attempting to rescue the decedent with inadequate and/or defective equipment incapable of completing a rescue in the conditions confronting the decedent[;]" and 6) "Failing to institute adequate and reasonable procedures for use in the event defendant was notified of a missing person and/or if said procedures existed, not following said procedures when decedent was reported missing." Compl. ¶¶ 12, 23.  In addition, although not specifically alleged in the Complaint, the Plaintiff further argues in her opposition brief that the Town of Stratford and Patusky were negligent by failing to install a hard wired emergency telephone or

17

to ensure that cellular service was available at the location of Long Beach where the decedent was kite-surfing.

The Court's above analysis concluding that qualified immunity bars the Plaintiff's negligence claims against the Firefighter Defendants in connection with the rescue attempt applies equally to the Town of Stratford and Patusky.[2]  With respect to the Town of Stratford, the Plaintiff makes the additional argument that the Town was negligent by failing to have a larger rescue boat in commission during the winter months.  The facts show that the Stratford Police Department has a boat larger than the zodiac boat used by the Fire Department in their rescue attempt, but this boat was taken out of the water months before January 21, 2006.  However, there is no evidence in the record that the failure to deploy the larger boat prevented the decedent's rescue.  Moreover, even assuming that the Town of Stratford could be found negligent for failing to have this larger boat in service in January, they would be entitled to qualified immunity as to this claim as well because the decedent was not an identifiable person subject to imminent harm at

---

[2]  **The Town of Stratford is entitled to the same discretionary act immunity that applies to the individual Defendants in this case.  The Connecticut legislature codified the tort liability of municipalities in Conn. Gen. Stat. § 52-557n.  Section 52-557n (a)(1) states that "[e]xcept as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by:  (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . ."  However, § 52-557n(a)(2)(B) extends the same discretionary act immunity that applies to municipal officials to the municipalities themselves by providing that municipalities will not be liable for damages caused by "negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law."  See Violano v. Fernandez, 280 Conn. 310, 320 (2006).**

the time the decision was made to remove the boat from the water.  The Plaintiff argues that the Plaintiff was a member of a foreseeable class of victims, namely, kite-surfers who used Long Beach on a regular basis.  However, the only identifiable class of foreseeable victims that the Connecticut Supreme Court has recognized is that of school children who are statutorily compelled to attend public schools during school hours.  See Durrant, 284 Conn. at 107.  Obviously, the presence of the decedent and other kite-surfers at Long Beach was entirely voluntary.  Moreover, the group of people who use Long Beach for kite-surfing and other water sports, and thus may need to be rescued, is naturally an ill-defined and amorphous group, rather than a clearly identifiable class.  Nor was the harm at issue in this case "imminent" in the sense contemplated by the Connecticut Supreme Court.  As in Evon, where the Connecticut Supreme Court held that the risk of fire was not an imminent harm, the risk of drowning "implicates a wide range of factors that can occur, if at all, at some unspecified time in the future." 211 Conn. at 508.

The Plaintiff's remaining negligence claims against the Town of Stratford and Patusky are premises liability claims in which she alleges that these Defendants were negligent because they failed to post warning signs or erect barriers preventing access to Long Beach during the winter, failed to have lifeguards on duty or warn that no lifeguards were on duty, and failed to install an emergency telephone or a cellular tower.  The duty owed by a landowner to an entrant onto the land is determined by the entrant's status as a trespasser,

**19**

licensee, or invitee.  See Salaman v. Waterbury, 246 Conn. 298, 304-05 (1998).  "In general, there is an ascending degree of duty owed by the possessor of land to persons on the land based on their entrant status, i.e., trespasser, licensee or invitee."  Morin v. Bell Court Condo. Ass'n, Inc., 223 Conn. 323, 327 (1992).  "A possessor of land has a duty to an invitee to reasonably inspect and maintain the premises in order to render them reasonably safe."  Id.  "In addition, the possessor of land must warn an invitee of dangers that the invitee could not reasonably be expected to discover."  Id.  "The duty that a . . . [possessor of land] owes to a licensee, [however,] does not ordinarily encompass the responsibility to keep the property in a reasonably safe condition, because the licensee must take the premises as he finds them."  Id.  "As a general rule, the possessor of real estate owes no duty to trespassers . . . to keep the property in a reasonably safe condition for their use."  Id. (internal quotation marks omitted).  "A public invitee is a person who is invited to enter or remain on land as a member of the public for the purpose for which the land is held open to the public."  Kurti v. Becker, 54 Conn. App. 335, 338 (1999).

The Plaintiff claims that the Town of Stratford and Patusky invited the public to use Long Beach for kite-surfing, including during the winter months, and therefore owed the decedent and other kite-surfers a duty of care.  However, the Plaintiff cites no evidence to support her claim that these Defendants took any actions which could be construed as extending an invitation to the decedent or others to kite-surf at Long Beach during the month of January.  See id. ("The

distinction between one who is an invitee and one who is merely a licensee turns largely on whether the visitor has received an invitation, as opposed to permission, from the possessor of the land, to enter the land or remain on the land.").  There is no evidence, for instance, that the Town made any improvements upon the area of Long Beach where the decedent was kite-surfing.  See, e.g., Lyles v. City of Stamford, No. CV970340593S, 2000 WL 1838707, at *3 (Conn. Super. Ct. Nov. 22, 2000) (finding question of material fact as to status of decedent who drowned in Long Island Sound where City made improvements on land at Southfield Beach in the form of playground equipment, basketball courts, a picnic area, bathhouse and parking lot, and imported sand to restore and expand the beach following a storm).

Moreover, even if the Town of Stratford and Patusky owed the decedent a duty of care as an invitee, that duty extends only to "dangers that the invitee could not reasonably be expected to discover."  Morin, 223 Conn. at 327.  Here, the decedent was engaged in an inherently dangerous water sport during the month of January, when the water temperature was between 38 degrees and 40 degrees Fahrenheit.  Guimond testified that the decedent arrived at the beach at approximately 3:30 p.m., when weather conditions took a turn for the worse as a storm approached.  By the time the decedent entered the water, it had begun to get dark and the wind was blowing strongly away from shore, creating "squall" like conditions and prompting other kite-surfers to return to shore.  In addition, Guimond expressed his concern to the decedent about the equipment he was

using.  The risk of engaging in an extreme water sport in such conditions was patently obvious to any reasonable person, and the Defendants should not be held liable for their failure to warn of this risk.  See Salaman v. Waterbury, 246 Conn. 298, 307 (Conn. 1998) (holding that the City "was not required to remind adult swimmers of the obvious and commonly known dangers of drowning inherent in swimming"); see also Sartoris v. State, 133 A.D.2d 619, 619 (N.Y. App. Div. 1987) ("One who engages in water sports assumes the reasonably foreseeable risks inherent in the activity.").  As the Connecticut Supreme Court held in Salaman,

> A rule requiring a property owner to post warning signs about the dangers inherent in swimming is unreasonable.  In Connecticut, a small state, hundreds of miles of shoreline would be exposed to this unreasonable requirement.  Property owners who have water on their land are entitled to assume that a reasonable adult would be aware of the risk of drowning in a body of water.

Id.  The reasoning of Salaman is even more compelling in this case, as it would be highly unreasonable to expect property owners to warn adults of the dangers of engaging in an extreme water sport in the middle of winter during storm-like conditions.

Finally, even if the Town of Stratford and Patusky had a duty to warn the decedent of the conditions in Long Island Sound by posting signs or erecting barriers, they would be entitled to qualified immunity and thus the Plaintiff's claims would still fail.  As discussed above, municipalities and municipal officials are immune from liability for negligence arising out of their discretionary, as opposed to ministerial, acts.  Martel, 275 Conn. at 48-49; Violano, 280 Conn. at 320. Ministerial acts are "acts to be performed in a prescribed manner without the

exercise of judgment or discretion."  <u>Doe</u>, 279 Conn. at 615.  "The maintenance of parks . . . is a governmental function and is usually subject to municipal immunity for negligence."  <u>Boucher v. Fuhlbruck</u>, 26 Conn. Supp. 79, 81 (1965).  The Plaintiff has failed to cite any statute or regulation prescribing the posting of signs or warnings, or the stationing of life guards, at public beach areas during the winter months.  Nor has the Plaintiff adduced the testimony of any witness or any other evidence suggesting that the Town of Stratford or Patusky, as Director of Parks and Recreation for the Town, were obligated or expected to post signs and warnings or station lifeguards at public beaches during the winter months.  The Defendants, on the other hand, have submitted an affidavit and attached job description from Patusky stating that she is not responsible for placing signs, erecting barriers, or warning the public that lifeguards are not on duty at Long Beach during the winter months.  <u>See</u> Def. Ex. F.

Similarly, the Plaintiff cites no ordinance, statute, or regulation prescribing the provision of a phone service, whether hard-wired or cellular, at Long Beach. In fact, pursuant to Connecticut statute, the Connecticut Sitting Council, not the Town of Stratford, oversees the installation of telecommunications towers.  <u>See</u> Conn. Gen. Stat. § 16-50g et seq.  Because the Plaintiff fails to cite evidence of any statutory or other obligation from which the Court may determine that there is some question of fact as to whether the acts in question were ministerial rather than discretionary, the Court finds that the Town of Stratford and Patusky are entitled to qualified immunity as to the Plaintiff's claims of negligence for failure to

warn and failure to provide phone services.  See Peterson v. Town of North

Canaan, No. CV000082985, 2001 WL 950905, at *1-*2 (Conn. Super. Ct. July 24,

2001); see also Boucher, 26 Conn. Supp. at 81-82 (holding that city officials were

entitled to qualified immunity against allegations of negligence for, *inter alia*,

failing to place barriers around river, to supervise river areas, to post warnings

signs, and to have railings or safety devices along banks of river because such

allegations involved discretionary rather than ministerial acts on the part of the

city officials).

### D.  Indemnification Claims Against the Town of Stratford

The Plaintiff also asserts claims for indemnification against the Town of

Stratford pursuant to Conn. Gen. Stat. § 7-465.  "Section 7-465 is an indemnity

statute; it does not create liability.  Under Section 7-465, the municipality's duty to

indemnify attaches only when the employee is found to be liable and the

employee's actions do not fall within the exception for willful and wanton acts."

Myers v. City of Hartford, 84 Conn. App. 395, 400 (2004).  Section 7-465 imposes no

liability upon a municipality for breach of any statutory duty of its own.  Ahern v.

New Haven, 190 Conn. 77, 82 (1983).  "The obligation imposed is indemnification

for the legal liability arising out of certain tortious conduct of the municipal

employee," and "[t]he municipality's liability is derivative."  Id.  Section 7-465

does not create liability which did not previously exist.  See Boucher, 26 Conn.

Supp. at 83.  The statute "provides for indemnification by the municipality of the

employee's liability and not for the assumption of the liability."  Id.  "A plaintiff

**24**

bringing suit under General Statutes § 7-465 first must allege in a separate count and prove the employee's duty to the individual injured and the breach thereof. Only then may the plaintiff go on to allege and prove the municipality's liability by indemnification."  <u>Sestiso v. City of Groton</u>, 178 Conn. 520, 527 (1979).

　　　As set forth above, there are no genuine issues of material fact with regard to the Plaintiff's claims for negligence against the individual defendants such that they are entitled to judgment as a matter of law and are not liable to the Plaintiff for any damages.  Since the Town of Stratford's liability as to these claims is derivative only, there are no damages for which the municipality is obligated to pay pursuant to Conn. Gen. Stat. § 7-465.  Accordingly, the Plaintiff's indemnification claims against the Town of Stratford must be dismissed.

### E.  <u>Nuisance Claim Against the Town of Stratford</u>

　　　Finally, the Plaintiff brings a claim for nuisance against the Town of Stratford.  To succeed on a claim for common-law nuisance, the Plaintiff must prove four elements:  "(1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; and (4) the existence of the nuisance was the proximate cause of the plaintiffs' injuries and damages."  <u>Elliot v. City of Waterbury</u>, 245 Conn. 385, 421 (1998).  In addition, where, as here, the Plaintiff asserts a public nuisance rather than a private nuisance, the Plaintiff has the additional burden of "proving that the nuisance interferes with a right common to the general public."  <u>Id.</u>  "Finally, in order to

**25**

overcome the governmental immunity of municipal defendants where it applies, the plaintiff must prove that the defendants, by some positive act, intentionally created the conditions alleged to constitute a nuisance."  Id.; see also Keeney v. Old Saybrook, 237 Conn. 135, 162-63 (1996).  "[L]iability can be imposed on the municipality only in the event that, if the condition constitute[s] a nuisance, it was created by some positive act of the municipality."  Id. at 164 (internal quotation marks omitted).

The alleged nuisance that the Plaintiff complains of in this case is the hazardous condition of the waters in the Long Island Sound adjacent to Long Beach where the decedent was kite-surfing.  Assuming that the Plaintiff could prove the elements of a public nuisance, her claim would still be barred because she has adduced no evidence of any positive act on the part of the Town of Stratford that created the condition complained of.  Obviously, the hazardous condition of the waters in Long Island Sound during the winter months was a naturally occurring condition, not a condition created by the municipality.  The Plaintiff asserts that the Town of Stratford is nonetheless responsible for the nuisance created by the waters because it was aware of the presence of kite-surfers at the Long Beach area during the winter months but failed to warn them of the dangers or erect barriers and warning signs, and failed to install an emergency telephone or a cellular tower.  However, "failure to remedy a condition not of the municipality's own making is not the equivalent of the required positive act in imposing liability in nuisance upon a municipality."  Lukas v. New Haven,

184 Conn. 205, 210 (1981) (holding that icy condition on public street which caused the plaintiff's injury was natural in origin and therefore municipality was not liable in nuisance for failing to remedy it).  Accordingly, the Plaintiff's nuisance claim is dismissed.

### III.  <u>CONCLUSION</u>

Based upon the above reasoning, the Defendants' motion for summary judgment is GRANTED.  The Clerk is directed to enter judgment for the Defendants, and to close this case.

IT IS SO ORDERED.

_____/s/_____

Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  February 12, 2010